THE UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| ARISTA RECORDS, INC. <u>et</u> <u>al.</u>,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>FLEA WORLD, INC., <u>et</u> <u>al.</u>,<br><br>　　　　　Defendants. | HON. JEROME B. SIMANDLE<br><br>Civil Action<br>No. 03-2670 (JBS)<br><br>**<u>OPINION</u>** |

APPEARANCES:

Karen A. Confoy, Esq.
STERNS & WEINROTH, P.C.
50 West State Street, Suite 1400
P.O. Box 1298
Trenton, NJ 08607-1298
　　and
Patricia Benson, Esq.
Jeffrey D. Goldman, Esq.
Eric J. German, Esq.
MITCHELL SILBERBERG & KNUPP LLP
11377 West Olympic Boulevard
Los Angeles, CA 90064-1683
　　and
Stanley Pierre-Louis, Esq.
Karyn A. Temple, Esq.
RECORDING INDUSTRY ASSOCIATION OF AMERICA, INC.
1330 Connecticut Avenue N.W., Suite 300
Washington, D.C. 20036-1725
　　Attorneys for Plaintiffs

Matthew R. McCrink, Esq.
McCRINK, NELSON & KEHLER
475 Route 73 North
West Berlin, NJ 08091
　　Attorney for Individual Defendants John Ackerman and Charles
　　Pratt

Randolph Huis, Esq.
Ryan W. O'Donnell, Esq.
VOLPE AND KOENIG, P.C.
United Plaza, Suite 1600

30 S. 17th Street
Philadelphia, PA 19103
    Attorneys for Defendant Columbus Farmers Market, LLC

Michael N. Onufrak, Esq.
Thomas A. Warnock, Esq.
WHITE AND WILLIAMS, LLP
1800 One Liberty Place
Philadelphia, PA 19103-7395
    Attorneys for Defendants Columbus Flea World, LLC, Flea
    World, Inc., and Flea World, LLC

## TABLE OF CONTENTS

I.   BACKGROUND . . . . . . . . . . . . . . . . . . . . . . 5
     A.   General Operations of the Columbus Flea Market . . . 6
     B.   Services Provided by the Market . . . . . . . . . . 9
     C.   Security at the Flea Market . . . . . . . . . . . 12
     D.   History of Sale of Infringing Goods at the Market   13
     E.   Procedural History . . . . . . . . . . . . . . . 17

II.  SUMMARY JUDGMENT STANDARD . . . . . . . . . . . . . . 18

III. DISCUSSION . . . . . . . . . . . . . . . . . . . . . 20
     A.   Direct Infringement . . . . . . . . . . . . . . . 21
     B.   Vicarious Liability . . . . . . . . . . . . . . . 23

          1.   Right and Ability to Supervise Vendors . . . . 25

          2.   Financial Benefit from Infringing Vendors . . 30

               a.   Direct financial benefit . . . . . . . . 31
               b.   Infringing music as a "draw" . . . . . . 32

     C.   Contributory Infringement . . . . . . . . . . . . 37

          1.   Plaintiffs' Motion for Summary Judgment . . . 37

               a.   Knowledge of Infringing Activity . . . . 38
               b.   Material Contribution to Infringement.   42

          2.   Defendants' Motion for Summary Judgment . . . 44

     D.   Personal Liability for Ackerman and Pratt . . . . 47

2

E.   **Whether Claims Arising from the June 2000 Raid are Time-Barred** . . . . . . . . . . . . . . . . . . . **52**

F.   **Plaintiffs' Maximum Potential Statutory Damages Award** . . . . . . . . . . . . . . . . . . . . . . . **56**

IV.   **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . **60**

**SIMANDLE,** District Judge:

In this matter, Plaintiffs Arista Records, Inc., Sony Music Entertainment, Inc. and a number of other recording companies (referred to collectively hereinafter as "Plaintiffs") have filed suit against defendants Flea World, Inc., Flea World LLC, Columbus Flea World, LLC, Columbus Farmers Market LLC, John Ackerman and Charles Pratt, among others, alleging that the defendants are liable for contributory infringement and vicarious liability for infringement of Plaintiffs' copyrights (in violation of the Copyright Act, 17 U.S.C. §§ 101 et seq.) related to the defendants' ownership and operation of a large, continuous flea market. Plaintiffs allege that the flea market is a "pirate bazaar" where many of the flea market's vendors sell pirate and counterfeit compact discs ("CDs") and cassette tapes ("cassettes") in violation of federal copyright laws.[1]

---

[1] Sound recording piracy involves one or more forms of unauthorized duplication or recorded sounds without the permission of the owner of the recording, including both "pirate" and "counterfeit" recordings. (Plaintiffs' Statement of Undisputed Facts, ("Pls.' SUF") ¶ 3.) "Counterfeit" recordings contain unauthorized duplications of not only the actual sounds from a copyrighted sound recording, but also any original artwork, trademark and packaging of the original product. (Id. ¶

Plaintiffs allege that the defendants are legally responsible for
the direct infringement of the third-party vendors because the
defendants (a) had knowledge of and materially contributed to the
vendors' infringing activity (contributory infringement) or (b)
had the ability to supervise and control the direct infringement
and financially benefitted from it (vicarious liability).

This matter comes before the Court upon the motion for
partial summary judgment brought by defendants Columbus Farmers
Market, LLC, Columbus Flea World, LLC, John Ackerman and Charles
Pratt [Docket Item No. 82][2] and the cross-motion for summary
judgment brought by Plaintiffs against all Defendants.  [Docket
Item No. 83.]  These motions raise important issues regarding the
responsibility of the corporate Defendants for vicarious
liability for, and contributory infringement to, the infringing
sales of their vendors, as well as the scope of potential
liability of the individual Defendants (who are corporate
officers and managers) for these infringements.  The opinion must
also address whether the earliest allegations of infringement are
time-barred by operation of Rule 4(m), Fed R. Civ. P., whether

_____

4.)  So-called "pirate" recordings contain (without
authorization) copyrighted sound recordings from various
legitimate album releases, but do not attempt to duplicate the
content, artwork and packaging of any specific, original,
legitimate release.  (Id. ¶ 5.)

   [2]  Defendants Flea World, Inc. and Flea World, LLC did not
join in the other Defendants' motion.

Plaintiffs' proposed expert's opinion should be barred under Rule 702, Fed. R. Evid., and whether available statutory damages are limited by treating each CD and cassette compilation as a single "work" under 17 U.S.C. § 504(c).

For the reasons discussed herein, this Court finds Plaintiffs are entitled to summary judgment against the corporate Defendants Columbus Farmers Market, LLC and Columbus Flea World, LLC, for vicarious infringement and contributory infringement, but material factual disputes prevent entry of summary judgment against the individual Defendants (Ackerman and Pratt) and summary judgment is denied as against Flea World, Inc. and Flea World, LLC; this Court further finds that the earliest allegations are not time-barred, that Plaintiffs' expert's opinion is admissible, and that 17 U.S.C. § 504(c) treats a CD or cassette compilation as a single "work," thus limiting statutory damages.

## I.   <u>BACKGROUND</u>

Plaintiffs are fourteen member companies of the Recording Industry Association of America ("RIAA"), a not-for-profit trade association whose member companies create, manufacture and/or distribute approximately 90 percent of all legitimate sound recordings sold in the United States.  The defendants in these motions are Columbus Flea World, LLC, Columbus Farmers Market LLC, John Ackerman and Charles Pratt (owners and operators of the

5

Columbus Farmers Market (the "Market").[3]   (Defendants' Statement
of Undisputed Material Facts ("Defs.' SUMF") ¶ 1.)   This Opinion
will generally use the term "Defendants" or "corporate
Defendants" to mean Columbus Flea World, LLC and Columbus Farmers
Market LLC, while the term "individual Defendants" refers to John
Ackerman and Charles Pratt.

### A.   General Operations of the Columbus Farmers Market

The Columbus Farmers Market, one of the largest flea markets
on the east coast, is a farmers market on Route 206 in Burlington
County, New Jersey.  (Defs.' SUMF ¶ 2.)  It is a combination
outdoor flea market, a large produce stand and indoor 80,000
square foot retail complex.  (Affidavit of John Ackerman ¶ 5.)
The outdoor portion of the flea market holds approximately 1,500
vendor spaces, (Id. ¶ 8; Affidavit of Charles Pratt ¶ 4), and
consists of approximately 1,100 open-air booths and 400 covered
"pole-barn" spaces.  (Pls.' SUF ¶ 272.)  The indoor portion of
the market consists of five buildings that house over 60 retail

---

[3]  Plaintiffs' papers have not focused on the roles, if any,
played by the other two corporate Defendants, namely, Flea World,
Inc. and Flea World, LLC, nor has opposition to Plaintiffs'
motion been presented on behalf of Flea World, LLC and Flea
World, Inc.  Also, as noted above, neither Flea World, LLC nor
Flea World, Inc. joined the other Defendants' motion for summary
judgment.  In this summary judgment motion in which Plaintiffs
bear the burden of establishing at least a prima facie case of
liability against these Defendants, this Court is unable to
adjudicate the precise circumstance under which Flea World, Inc.
and Flea World, LLC would, or would not, be liable.  Accordingly,
Plaintiffs' motion for summary judgment must be denied without
prejudice as to Defendants Flea World, Inc. and Flea World, LLC.

stores.  (Ackerman Aff. ¶ 5.)  The market is open Thursday,
Saturday and Sunday, with prime hours of operation running from
approximately 7:30 a.m. to 1:00 p.m.  (Id.)

In 1999, Columbus Flea World, LLC ("CFW") was formed and
ownership of the market business was divided in two.  (Deposition
of Charles Pratt at 280-81.)  Currently, the outdoor market is
operated and maintained by CFW while the indoor portion of the
market is operated by Columbus Farmers Market LLC ("CFM").  (Id.;
Defs.' SUMF ¶ 4.)  Specifically, CFM owns the land on which the
market is located and the market's buildings and fixtures.
(Pls.' SUF ¶ 32.)  CFW licenses from CFM the "sole and exclusive
right to supervise and conduct the flea market" in the outdoor
portion of the market.  (Pratt Depo. Tr. at 278-79.)  The sole
members of both limited liability companies are two entities
owned and controlled by Defendants John Ackerman and Charles
Pratt. (Pratt Depo. Tr. at 282-84; Deposition Transcript of
Janice Ackerman at 44-45.)  According to Defendants' bookkeeper,
Ackerman and Pratt are two of the individuals that receive money
from payments to CFW and CFM.  (Pls.' SUF ¶¶ 275-76.)  In
addition, the relationship between CFW and CFM appears to be more
than simply a landlord-tenant relationship as all Market
employees are paid by checks issued by CFW and CFW is the name
party on a contract for certain security services that directly
benefit CFM.

The Market operates like a typical flea market.  The
Defendants charge fees to vendors who then sell merchandise to
the Market's customers.  (Pls.' SUF ¶ 8.)  The fee varies
depending on the day of the week, the type and location of the
vendor's space, the duration of use and whether the vendor is
selling new or used merchandise but typically, the daily vendor
rate $20 or $30 per space.  (Id. ¶ 8; Pratt Aff. ¶ 4; Ackerman
Depo. Tr. 92-93.)  Income from renting spaces is the Market's
only source of revenue as Defendants do not charge for parking or
admission, do not receive commissions on vendor sales, nor do
they operate any concessions or receive a commission from the
sale of merchandise sold at the Market.  (Defs.' SUMF 30, 32, and
33.)

The individual Defendants, Ackerman and Pratt, play an
active role in the day-to-day operations of the Market.  (Pratt
Depo. at 281, 284.)  They are generally viewed as the "bosses" of
the Market, and, according to Ackerman, are largely "responsible
for everything at the Market."  (Deposition Transcript of Donald
Cummings at 35; Ackerman Depo. Tr. at 26.)  Employees at the
market state that they are always able to get in touch with
either Ackerman or Pratt and that they are constantly
communicating with Market employees as management issues arise.
(Deposition Transcript of George Coppola at 149-150)  For his
part, Ackerman stands in the parking lot selling daily permits to

8

market vendors and participates in counting receipts.  (Pls.' SUF
¶ 36.)   Ackerman also walks the market to check vendors for
unpaid rent, to examine the general set-up of the Market and to
look for safety hazards.  (Id. ¶ 37.)  Every Thursday, both
Ackerman and Pratt walk by all of the tables in the section of
the Market where used merchandise is sold in order to "observe
the merchandise that is being sold."  (Id. ¶ 53.)

> ## B.   **Services Provided by the Market**

The Market provides vendors and customers with a number of
services including booth space, tables, parking, utilities, on-
site food and drink concessions, and customers.  (Id. ¶¶ 71-74,
79-80, 88-89.)  The market also provides restrooms, maintenance
and sanitation, and upkeep on all facilities and fixtures.  (Id.)
Finally, Defendants advertise extensively to promote the Market
(as a "Bargain Hunters [sic] Dream") and the products of their
vendors.  (Id. ¶ 7.)  Advertising efforts include the operation
of a web site promoting the Market, (id. ¶ 63,) running seasonal
promotions (such as specials that have holiday themes) and
"tipping" bus drivers to "bring people to the Market."  (Id. ¶¶
61-62.)

Market employees take vendor booth reservations.  In order
to reserve space, a prospective vendor must complete an
application that provides the Market with the vendor's name,
address, telephone number and a description of the products the

vendor intends to sell.  (Id. ¶ 64.)  Providing this information,
which is stored on computer file at the Market's main office, is
a prerequisite to selling goods at the market - a vendor cannot
reserve space without disclosing this type of information.[4]
(Cummings Depo. Tr. at 121.)  Each vendor is given a ticket which
is checked when the vendor enters the Market.  (Pratt Depo. Tr.
45.)  According to the Market's on-site manager, Donald Cummings,
Market employees can access the computer in the main office to
determine where a particular vendor is "supposed to be" located.
(Pls.' SUF ¶ 96.)  The Market also closely regulates the time a
vendor can enter the Market and the time that they must vacate.
(Ackerman Depo. Tr. 69-70.)

    The Market also provides each vendor with a set of rules and
regulations and reserves the right to refuse or terminate vendor
space at its sole discretion.  (Ackerman Depo. Tr. at 69.)  In
particular, the market reserves the right to inspect all
merchandise or other items sold or offered for sale at the

_____

    [4] Some Market employees, however, state that the Market
cannot track what vendors sell in the Market, having tried to
obtain this information before, but determined that it would be
virtually impossible to do so.  (Pratt Depo. Tr. 52-54)  Market
employees also testified that the records are often inaccurate or
incomplete, (Pls.' SUF ¶ 97), and are not updated to reflect
changes regarding whether a vendor has been evicted from the
Market for selling counterfeit merchandise.  (Pratt Depo. Tr. at
168.)  Furthermore, these records are kept on a computer in need
of upgrading.  (Voss Depo. Tr. at 247)(Voss testified that, in
early 2004, she started "pressing" the Market to replace outdated
software it previously used.)

Market.  (Defs.' Response to Request for Admission No. 31.)
Pursuant to its rules and regulations, the market prohibits the
sale of pets, explosives, firearms, ammunition, firecrackers,
flares, starter pistols and alcoholic beverages (among other
items) and regulates the manner in which a vendor can display
merchandise (for example, a vendor may not display pornographic
materials in plain view).  (Id. at No. 29.)  The Market also
prohibits the sale of food without a license.  (Pls.' SUF ¶ 134.)
The market rules state that the sale of "counterfeit merchandise
is prohibited." (Ackerman Depo. Tr. at 69, 102.)

        The Market has evicted and permanently banned vendors for
violating Market rules.  (Pls.' SUF ¶ 122.)  Security personnel
at the Market also check the Market for instances where vendors
have parked their cars in an uneven manner and instruct them to
correct this.  (Cummings Depo. Tr. at 191.)  The market has
evicted vendors in the past for fighting, "space jumping" (moving
from the vendor's assigned space to another space), occupying
space without payment, displaying pornography and other
infractions.  (Cummings Depo. Tr. 180-81, 189-91; Coppola Depo.
Tr. 124, 297.)  The Market also helps vendors apprehend and
prosecute shoplifters and provides refunds to customers who
complain that they were treated unfairly by a vendor.  (Pls.' SUF
69-70, and 91)  The market does not maintain a formal "blacklist"
of vendors that are not permitted on the premises, but such

vendors are "known" to Market personnel and excluded from entry into the Market.  (Cummings Depo. Tr. at 145, 286; Coppola Depo. Tr. at 127.)

Employees of the Market also work to manage competition among the various vendors.  (Pls.' SUF ¶¶ 112-13.)  To manage competition and reduce disputes between vendors, the Market implemented and enforced what it calls the "seven spaces" rule, which requires vendors that sell similar items to be separated by at least seven spaces in the Market.  (Id.)  Market employees eject vendors who refuse to comply with this rule.  (Id.)  So that vendors do not to run afoul of this rule, Market employees (1) determined the appropriate space for each vendor and (2) regulated attempts to transfer a seller's permit to persons other than the vendor of record.  (Id. ¶ 112, 139.)

### C.   **Security at the Flea Market**

In 1988, Ackerman and Pratt acquired a general partnership interest in the Market, through an entity called Columbus Farmers Market Associates.[5]  Prior to Ackerman and Pratt's ownership of the Market, the Market had no problems with sound recording piracy.  (Deposition Transcript of Verna Volmer at 10, 47-48.) However, in 1991 and 1992, confidential informants told the RIAA

---

[5]  From 1988 to 2000, Ackerman and Pratt operated the Market as a single entity, first through Columbus Farmers Market Associates, and then through Defendant CFM (which was formed in 1998.)  (J. Ackerman Depo. Tr. at 62; Pratt Depo. Tr. 280; Voss Depo. Tr. 43, 153.)

that Market vendors were selling illegal sound recordings.
Recently, the Market has engaged both its own security force and
the local police to patrol the Market and look for, among other
things, pirated and counterfeit goods.  (Defs.' SUMF ¶ 41.)
Defendants state that, from 2000 to 2003, CFW spent a total of
approximately $200,000 on security to enforce the rules at the
outdoor flea market.  (Id. ¶ 40.)  Since May of 2002, an officer
from the Springfield Township Police Department has been assigned
to the outdoor flea market from 9:30 to 2:00 most Thursdays and
Sundays.  (Id. ¶ 41.)  Defendants contend that after the RIAA
made the market aware of a potential problem with counterfeit CDs
and cassettes being sold, they contracted with the local police
to monitor the market for pirated goods on a regular basis.
(Ackerman Aff. ¶¶ 11, 16, and 17; Defs.' Response to Pls.' SUF ¶
10.)

**D.   History of Sale of Infringing Goods at the Market**

Plaintiffs contend that all Defendants blatantly continue to
provide Market vendors with the site, facilities and market to
openly sell pirated and counterfeit CDs and cassettes, despite
the fact that (i) law enforcement agencies have conducted
multiple raids of the premises and seized thousands of infringing
CDs and cassettes, and (ii) the RIAA has repeatedly notified
Defendants of infringing vendors and offered to assist the Market
in curtailing the sale of counterfeit and pirate CDs.  (SAC ¶¶

13

43-60.)  In fact, between July 1999 and May 2003, Plaintiffs'
investigators observed market vendors selling infringing sound
recordings on twenty-seven different occasions and have, at
times, informed Market employees of the specific booth numbers of
vendors selling counterfeit sound recordings.

The parties do not dispute that there has been a great deal
of interaction between the market, the RIAA, and law enforcement
officials, including the U.S. Marshals Service and the
Springfield Police Department.  Such incidents include:

- In 1993, RIAA investigators observed infringing vendors
  making sales on multiple occasions leading to an <u>ex parte</u>
  seizure by the U.S. Marshals Service of 3,500 infringing
  sound recordings (the "1993 Raid") (Declaration of
  Richard Abbott ¶ 5-7);

- In 1994, the Burlington County Prosecutors Office
  conducted a raid at the Market, arresting 26 vendors for
  selling various types of counterfeit merchandise (the
  "1994 Raid") (Pls.' SUF ¶ 177);

- On June 4, 2000, the Springfield Police Department, in
  conjunction with the Burlington County Prosecutors
  Office, raided the Market, arrested twelve individuals,
  and seized infringing CDs and cassettes (the "June 2000
  Raid") (Declaration of Rosalind Pettit-Sova ¶16;
  Declaration of Robert Barchiesi ¶ 18);[6]

- Thereafter, on June 16, 2000, the RIAA notified
  Defendants in writing of both their and their vendors'
  infringing conduct and of their violations of Plaintiffs'
  rights.  The RIAA also alerted Defendants to the
  applicable federal law and demanded that they cease
  facilitating infringement (Pls.' SUF ¶ 212);

---

[6] Chief Michael King of the Springfield Township Police
Department stated that the June 2000 raid was necessitated by the
Market's evident lack of enforcement regarding the sale of
counterfeit goods.  (King Depo. Tr. 199-200.)

- On July 6, 2000, an RIAA investigator and Chief King observed two vendors selling infringing sound recordings at the Market and Chief King instructed the vendors to leave (<u>Id</u>. ¶ 218);

- In a letter dated July 26, 2000, the RIAA again notified Defendants in writing that infringements were a continuing problem at the market.  A representative of the Burlington County Prosecutors Office subsequently spoke to Defendant Ackerman about the continuing problem of the sale of counterfeit goods at the Market; (Abbott Decl. ¶ 11, Ex. 3);

- On or about November 1, 2001, representatives of the RIAA and the Springfield Police Department attempted to speak to the head of security for the Market to inform him of continuing infringement and vendors selling CDs for as little as two dollars each.  The head of security is alleged to have refused to speak with representatives of either the RIAA or Springfield Police (Pls.' SUF ¶¶ 225-26);

- On or about December 6, 2001, a representative of the RIAA informed a representative of the Market of the presence of at least ten vendors selling infringing sound recordings (Declaration of James Trovarella ¶ 10 and Declaration of Thomas Valent ¶ 5);

- In a letter dated January 11, 2002, the RIAA again notified Defendants in writing that the sale of infringing CDs was continuing, attached relevant case law showing that Defendants would be liable for the vendors' infringement, and again offered to train Defendants to identify counterfeit sound recordings (Abbott Decl. ¶ 12, Ex. 4);

- On or about February 8, 2002, the RIAA yet again notified Defendants in writing that infringement was continuing at the Market (Abbott Decl. ¶ 14, Ex. 6);

- On or about March 7, 2002, the RIAA met with Defendants and counsel to discuss the continuing piracy problems and how to curtail the sale of counterfeit CDs and on May 21, 2002, counsel for the Market asserted that the "problem had been corrected" and that all vendors selling questionable products had been excluded from the Market (Abbott Decl. ¶ 16; Ackerman Depo. Tr. 177-78);

15

- On or about August 15, 2002, New Jersey State Police raided the Market and four vendors were arrested and approximately 647 illegal CDs were seized (the "August 2002 Raid") (Declaration of William Scott ¶ 13; Valent Decl. ¶ 7); and

- On November 7, 2002, another law enforcement raid of the Market premises yielded two additional arrests and the seizure of approximately 2,300 illegal CDs (the "November 2002 Raid"). (Scott Decl. ¶ 16.)

Either Ackerman, Pratt, or a Market employee walked the market every day. During these "walk-throughs," Defendants' personnel (including Ackerman and Pratt) collected money from vendors, inspected goods, and spoke with vendors. (Pls.' SUF ¶¶ 51-52.) Defendants, however, never either took any action towards or instructed any Market employee to document instances of vendors selling counterfeit merchandise. The market did implement a "three-strikes" policy (where a vendor was issued two formal warnings about selling infringing goods before being banned permanently from selling at the market). (Pls.' SUF ¶ 169l Pratt Depo Tr. at 150, 153, and 271.) However, according to Plaintiffs, the market neither (1) educated its employees about this policy nor (2) sought to enforce it. (Pratt Depo. Tr. 153-54.) Pratt states, however, that the Market advised individuals who were in charge of inspecting merchandise (e.g., Market security) of the three-strike policy, (id. at 53), and both Ackerman and Pratt testified that police officers assigned to the

16

Market were also made aware of the three-strike policy.
(Ackerman Depo. Tr. at 271; Pratt Depo. Tr. at 150.)

###      E.   Procedural History

This case has an extensive history of prior motion practice.
Plaintiffs filed their complaint on June 3, 2003, alleging that
Defendants ignored repeated demands from the RIAA to curtail the
sale of pirated and counterfeit compact discs and cassette tapes
at the Market. [Docket Item No. 1.]  Plaintiffs asserted claims
for contributory and vicarious copyright infringement.  On
October 1, 2003, Plaintiffs filed an Amended Complaint
identifying over 7,500 pirated recordings that had been sold at
the Market.  [Docket Item No. 3.]  Plaintiffs also added Flea
World LLC and Columbus Farmers Market LLC as additional
defendants.

Defendants filed their Answer, Separate Defenses and
Counterclaim on October 29, 2003, admitting that they provided
space and facilities to vendors who have sold and continue to
sell pirated and counterfeit CDs and cassettes.  [Docket Item No.
9.]  Plaintiffs filed a motion to dismiss the Counterclaim and to
strike eighteen of the asserted defenses.  [Docket Item No. 12.]
After the motion was fully briefed and submitted to this Court,
Defendants filed their Amended Answer and Counterclaim on
February 27, 2004.  [Docket Item No. 15.]  The Answer itself was

not amended, but Defendants asserted nine new defenses and amended their Counterclaim.

Plaintiffs moved to dismiss the Amended Counterclaim and to strike twenty-three defenses on March 26, 2004. [Docket Item No. 20.] On July 12, 2004, this Court granted Plaintiffs' motion and dismissed without prejudice Defendants' counterclaims. See Arista Records, Inc. v. Flea World, Inc., No 03-2670, Slip Op. at 1 (July 12, 2004) (hereafter, the "July 12 Opinion") (hereinafter the "July 12, 2004 Opinion"). [Docket Item No. 27.] On January 27, 2005, the Court denied Defendants' motion for reconsideration of Defendants' motion to dismiss. See Arista Records, Inc. v. Flea World, Inc., 356 F. Supp.2d 411 (D.N.J. 2005)("Flea World"). On March 11, 2005, with permission of the Court, Plaintiffs filed a Second Amended Complaint (the "SAC") against all Defendants. Defendants answered jointly on April 5, 2005.

On August 8, 2005, Defendants moved for partial summary judgment and Plaintiffs cross-moved for summary judgment. Both sides filed opposition to the others' motion on September 30, 2005 and both sides replied to the opposition on October 14, 2005. The submissions are indeed voluminous. This Court heard oral argument on these motions on November 4, 2005.

## II.  SUMMARY JUDGMENT STANDARD

Defendants and Plaintiffs have cross-moved for summary judgment pursuant to Rules 56(b) and 56(a), Fed. R. Civ. P.,

18

respectively.  A court may grant summary judgment when the
materials of record "show that there is no genuine issue as to
any material fact and that the moving party is entitled to
judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Lang v.
New York Life Ins. Co., 721 F.2d 118, 119 (3d Cir. 1983).  A
dispute is "genuine" if "the evidence is such that a reasonable
jury could return a verdict for the non-moving party."  Anderson
v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is
"material" only if it might affect the outcome of the suit under
the applicable rule of law.  See id.  Disputes over irrelevant or
unnecessary facts will not preclude a grant of summary judgment.
Id.[7]

      The summary judgment standard does not change when, as here,
the parties have filed cross-motions for summary judgment.  See
Appelmans v. City of Phila., 826 F.2d 214, 216 (3d Cir. 1987).
Cross-motions for summary judgment:

> are no more than a claim by each side that it alone is
> entitled to summary judgment, and the making of such
> inherently contradictory claims does not constitute an
> agreement that if one is rejected the other is
> necessarily justified or that the losing party waives

---

      [7]  Moreover, a non-moving party must do more than rely only
"upon bare assertions, conclusory allegations or suspicions."
Gans v. Mundy, 762 F.2d 338, 341 (3d Cir. 1985), cert. denied,
474 U.S. 1010 (1985) (citation omitted); see Liberty Lobby, 477
U.S. at 249-50.  Thus, if the non-moving party's evidence is a
mere scintilla or is "not significantly probative," the court may
grant summary judgment.  Liberty Lobby, 477 U.S. at 249-50;
Country Floors, 930 F.2d at 1061-62.

> judicial consideration and determination whether
> genuine issues of material fact exist.

Transportes Ferreos de Venezuela II CA v. NKK Corp., 239 F.3d
555, 560 (3d Cir. 2001) (citing Rains v. Cascade Indus., Inc.,
402 F.2d 241, 245 (3d Cir. 1968)).  If review of cross-motions
for summary judgment reveals no genuine issue of material fact,
then judgment may be entered in favor of the party deserving of
judgment in light of the law and undisputed facts.  See Iberia
Foods Corp. v. Romeo Jr., 150 F.3d 298, 302 (3d Cir. 1998)
(citing Ciarlante v. Brown & Williamson Tobacco Corp., 143 F.3d
139, 145-46 (3d Cir. 1988)).

## III. DISCUSSION

Both sides have moved for summary judgment arguing that no
genuine issues of material fact exist and that this Court should
rule that, as a matter of law, Defendants are either liable (in
Plaintiffs' view) or not liable (in Defendants' view) under the
theories of either vicarious liability or contributory copyright
infringement among other issues.  The issue of whether summary
judgment is appropriate against the corporate Defendants under
Plaintiffs' claim of vicarious liability will be addressed in
Section III.B. and Plaintiffs' claim of contributory infringement
by the corporate Defendants in Section III.C., infra.  Also, in
its motion papers, Plaintiffs argue that individual Defendants
Ackerman and Pratt should be held personally liable for the acts
of vicarious liability and/or contributory infringement, which

20

will be addressed in Section III.D., <u>infra</u>.   Next, the Court
will address two arguments raised by Defendants in their motion.
First, all Defendants argue that all claims of infringement
arising from the June 3, 2000 raid of the Market are time barred
due to Plaintiffs' failure to timely serve Defendants with the
original complaint and therefore, should be dismissed (<u>See</u>
Section III.E., <u>infra</u>.)   Finally, all Defendants argue that
Plaintiffs' maximum potential statutory damages award is limited
to the number of copyright registrations Plaintiffs have produced
(over 800) because statutory damages must be calculated on a
"per-CD" basis rather than a "per-song" basis under Section
504(c)(1) of the Copyright Act.   (<u>See</u> Section III.F., <u>infra</u>.)
The Court will address each sides' arguments in the order
outlined above after addressing the threshold issue of whether
direct infringement occurred at the Market.   (<u>See</u> Section III.A,
<u>infra</u>.)

### A.   <u>Direct Infringement</u>

Any finding of either contributory copyright infringement
or vicarious liability by this Court hinges on the Court first
concluding that vendors in the Market have directly infringed
Plaintiffs' copyrighted sound recordings.   <u>See In re Aimster</u>
<u>Copyright Litig.</u>, 334 F.3d 643, 646 (7th Cir. 2003)(hereafter
"<u>Aimster</u>")(direct copyright infringement is a threshold element
of both contributory and vicarious infringement, although the

direct infringer need not be named as a defendant.)  Sound
recordings are protected by copyright law and the owner of a
copyright in a sound recording has the exclusive right to
reproduce and distribute the copyrighted sound recordings in
phonorecords for sale to the public.  See 17 U.S.C. §§ 102(a)(7),
106(1),(3), 114.  When asserting ownership of a copyright, the
existence of a copyright registration certificate issued from the
United States Copyright Office is prima facie evidence of the
validity of the party's copyright and of the facts stated in the
certificates, including ownership of the copyright. See id. §
401(c).

     Here, Plaintiffs have presented the Court with registration
certificates and declarations attesting to Plaintiffs' ownership
of over 800 works alleged to have been infringed.[8]  (See SAC ¶
30, Ex. 1.)  In addition, Plaintiffs have presented voluminous
amounts of evidence of infringement of these copyrights by
various vendors at the Market.[9]  Thus, vendors at the market who

---

     [8]  Plaintiffs have submitted declarations from a number of
senior executives at recording companies that are plaintiffs
including Jennifer Pariser, Dave Palacio, Alasdair McMullan, JoAn
Cho, and Silda Palerm to demonstrate Plaintiffs' ownership of
copyrights to sound recordings of which counterfeit copies were
seized at the Market.  Defendants had the opportunity to request
additional registration and chain-of-title information about
Plaintiffs' ownership of the copyrights at issue, and no dispute
remains as to Plaintiffs' asserted copyrights.

     [9]  Specifically, Plaintiffs have submitted declarations from
a number of RIAA investigators and investigative consultants
including Richard Abbot, Robert Barchiesi, Robert Climaldi, James

sold counterfeit or pirate compact discs containing Plaintiffs'
copyrighted recordings directly infringed Plaintiffs' rights of
reproduction and distribution.  Moreover, in its Answer,
Defendants "admitt[ed] that they provide space and facilities to
vendors who have sold and continue to sell pirate and counterfeit
CDs and cassettes."  See Flea World, 356 F. Supp.2d at 415; July
12 Opinion at 13; see also Second Joint Amended Answer ¶¶ 2, 37,
38, 39.  Thus, Market vendors direct infringed Plaintiffs'
copyrighted music.

### B.  **Vicarious Liability**

_____ Plaintiffs claim that Defendants are liable for vicarious
copyright infringement stemming from the vendors' sales of
infringing materials.  The landmark case in the area of vicarious
liability for the sale of counterfeit recordings is Shapiro,
Bernstein & Co. v. H.L. Green Co., 316 F.2d 304, 307 (2d Cir.
1963), in which the Second Circuit Court of Appeals held that a
department store was vicariously liable for an independent
concessionaire's sale of counterfeit recordings on store
premises.  Under Shapiro, a party is vicariously liable for
copyright infringement if it (1) can supervise or control the
premises under which infringing material is sold and (2) obtained

---

Trovarello, Rosalind Pettit-Sova, William Scott, James Elliot,
Thomas Valent, Knox Owsley, Heriberto Feliciano, and Ryan Show in
order to demonstrate that vendors at the market have sold
counterfeit and infringing sound recordings.

a direct financial benefit from the infringing activities.  <u>See</u> <u>id</u>. at 307.[10]

The defendant's knowledge of the infringing activity is not an element of vicarious liability.  <u>See</u> July 12 Opinion at 17, <u>citing</u> <u>American Tel. & Tel. Co. v. Winback and Conserve Program, Inc.</u>, 42 F.3d 1421, 1441 (3d Cir. 1994).  Moreover, a party with the ability to supervise or control infringing activity cannot avoid liability by failing to exercise such supervision or control.  <u>See</u> <u>Gershwin Publ'g. Corp. v. Columbia Artists Mgmt, Inc.</u>, 443 F.2d 1159, 1161 (2d Cir. 1971) (The "failure to police the conduct of the primary infringer" is sufficient for the imposition of vicarious liability.)  Thus, Plaintiffs need only show that Defendants: (a) had the right and ability to supervise or control the infringing vendors, and (b) obtained a financial benefit from the infringing vendors.  <u>See</u> <u>id</u>.; <u>see</u> <u>American Tel. & Tel. Co.</u>, 42 F.3d at 1441; <u>Flea World</u>, 356 F. Supp.2d at 423.  Plaintiffs claim both elements are satisfied in the present case and this Court agrees.

---

[10]   The Ninth Circuit Court of Appeals has stated that the public policy behind the <u>Shapiro</u> decision is that a department store is best situated to take responsibility for the losses to third parties resulting from infringement by its for-profit enterprise.  <u>See</u> <u>Fonovisa v. Cherry Auction, Inc.</u>, 76 F.3d 259, 262 (9th Cir. 1996).

### 1.   <u>Right and Ability to Supervise Vendors</u>

Two courts have directly addressed the issue of whether an owner or operator of a flea market had the requisite ability to control vendors of infringing music to subject them to vicarious liability for copyright infringement.  See <u>Fonovisa</u>, 76 F.3d at 263-64; <u>UMG Recordings, Inc. v. Sinnott</u>, 300 F. Supp. 2d 993, 1001-02 (E.D. Cal. 2004).  The <u>Fonovisa</u> court, applying the rule in <u>Gershwin</u> and <u>Shapiro</u>, held that, where a director of a flea market (1) had broad contracts with vendors allowing the market to regulate the vendors' behavior and (2) actively participated in the policing of the vendors, the control element was of the vicarious liability test satisfied.  <u>Fonovisa,</u> 76 F.3d at 263.  The <u>Sinnott</u> court, also applying the <u>Shapiro</u> test, considered factors such as (1) the market's rules and regulations regarding vendors - particularly those allowing market employees to inspect merchandise being sold at the Market and to cancel space rentals if such rules are violated and (2) the market's rules restricting or prohibiting the sale of certain classes of goods such as food and beverage, firearms and ammunition.  See <u>Sinnott</u>, 30 F. Supp.2d at 1001.

Here, Defendants have in place all of the factors considered by the courts in <u>Fonovisa</u> and <u>Sinnott</u> related to control over the Market.  The corporate Defendants issued rules in which they expressly reserved the right to inspect all merchandise offered

for sale at the Market and eject any vendor who failed to comply with these rules.  (Ackerman Depo. Tr. 69; Defs.' Response to Request for Admission, No. 31.)  Second, market personnel (including Ackerman and Pratt) testified that they police the Market during their daily "walkthroughs" in which they to collect money, check vendor merchandise (including checking whether vendors are selling prohibited items) and generally check for safety hazards.  (Ackerman Depo. Tr. at 50; Pratt Depo. Tr. 13, 14, 36, and 243.)  Ackerman and Pratt also walk within three feet of many vendors.  (Mircoff Depo. Tr. 109, 111.)  Merchandise is generally uncovered on tabletops in plain view for customers to browse.  (Deposition of Springfield Township Police Chief King at 142.)  If the merchandise was hidden, Pratt testified that the vendor would be evicted.  (Pratt Depo. Tr. 30, 32.)

Third, like the market in Sinnott, the corporate Defendants exhibited control over vendors by prohibiting the sale of certain items (such as animals, explosives, firearms and alcoholic beverages) and limited vendors' rights to display certain materials, such as pornography.  (Defs.' Response to Request for Admission No. 29; Cummings Depo. Tr. 187-89.)  Defendants state that they regularly evicted vendors for these types of infractions.[11]  (Pls.' SUF ¶ 122.)  Fourth, the corporate

_____

[11]  As this Court stated in it July 12 Opinion, "It is difficult to understand how checking the vendors that sell recorded music for counterfeit merchandise is more burdensome

26

Defendants control who sells goods at the Market by collecting and maintaining a computer database of vendor information, including vendors' names, addresses, the nature or type of merchandise they sell, and their booth location.  (Pratt Depo. Tr. at 51; Cummings Depo. Tr. at 101.)

Finally, the Court notes that to some extent, the corporate Defendants' control over the vendors in the Market goes beyond those of the defendants in <u>Fonovisa</u> and <u>Sinnott</u>.  For example, Defendants control such details of the Market as requiring vendors to park their vehicles evenly and preventing vendors from moving from one space to another.  (Cummings Depo. Tr. 180-81, 191.)  Defendants also go so far as to actually regulate competition in the Market by instituting and enforcing the "seven spaces" rule.  (Cummings Depo. Tr. at 38; Ackerman Depo. Tr. at 94, 98.)  Thus, this Court finds that the corporate Defendants had sufficient right and ability to control the Market.  As such, the first prong of the <u>Shapiro</u> test is satisfied.

Defendants argue that they have not turned a blind eye to the sale of counterfeit materials. (Defs.' Opp. Br. at 17.) Instead, Defendants contend that they simply have no real control over vendors because the market is too large for Defendants' security personnel to police.  (<u>Id</u>.)  According to Defendants,

---

than checking for other prohibited goods such as firearms."  July 12 Opinion at 27.

they go so far as to (1) pay for a police presence at the Market
and (2) have established rules, posted signs and handed out
fliers to vendors alerting them that the sale of counterfeit
items is prohibited.  (Pratt Depo. Tr. at 229; Ackerman Aff. 6,
15-17, and 34.)  Defendants argue then that they cannot control
counterfeiting because Defendants must "proceed[] cautiously"
against vendors "because it can be difficult to detect infringing
CDs and because of the danger of false arrests and wrongful
seizures."  (Defs.' Opp. Br. at 17.)

Defendants cite Arista Music v. Reed Publ'g (USA), 1994 U.S.
Dist. LEXIS 6395 *13-14 (S.D.N.Y. 1994) and Adobe Systems Inc. v.
Canus Prods., Inc. 173 F. Supp. 2d 1044 (C.D. Cal. 2001) in
support of the position that they do not have adequate control of
the market to prevent the sale of counterfeit goods.  In Reed, a
district court in the Southern District of New York held that a
defendant-organizer of an apartment trade show event where four
out of 134 vendors infringed copyrighted songs did not possess
sufficient control over the vendors at the show to be liable for
vicarious copyright infringement.  See 1994 U.S. Dist. LEXIS at
*13-14.  In Adobe Systems, the district court held that a
defendant-promoter of a trade show was not liable for the
unauthorized sale of Adobe software even though defendant (i)
promoted the trade show, (ii) provided security and controlled
customer access, and (iii) reserved right to terminate vendors,

28

because defendant-promoter did not have sufficient control to prevent infringing activities.  See 173 F. Supp. 2d at 1053-55. Defendants argue that, given these holdings, it is "ludicrous" to suggest that the Market should be held liable for not being able to prevent all infringing conduct.  Reed and Adobe, involving one-time trade shows, are highly distinguishable from the ongoing, fixed market environment created and owned by the Defendants.  Here, infringing items were offered for sale on Defendants' premises by the Market's vendors from week-to-week and year-to-year, as revealed by the public raids and other detections discussed above.

The undisputed facts lead the Court to conclude that the Market is a controlled environment where the corporate Defendants have comprehensive rules governing what vendors can sell, how goods are displayed and how vendors behave.  The argument that Defendants must "proceed cautiously" in order to avoid making a false arrest is unpersuasive.  Defendants need not arrest vendors of counterfeit CDs - rather, Defendants can solve the counterfeiting problem by (1) working to identify the counterfeiters and (2) excluding them from the Market.

Second, the Court is not persuaded by Defendants' argument that the Market is too large to police, because such an argument makes no sense.  Defendants alone control the size of their market. They have developed one of the largest markets in the

29

eastern United States by their own choice.  If the Market's growth outpaced Defendants' ability to monitor and control what happens on their own premises by their own vendors, then they should have reduced the size and scope of their operations or hired more security to meet their obligations, or both.  Finally, Defendants' reliance on <u>Reed</u> and <u>Adobe</u> is misguided.  Both these cases turned on the fact that the direct infringement at issue could not be determined without a complex <u>legal</u> analysis.  Here, finding infringing sound recordings does not hinge on such a complex legal analysis, but only upon Defendants' recognizing indicia of piracy at the Market.  Defendants, who also chose not to cooperate with the expert investigators retained by Plaintiffs to monitor the market for counterfeit CDs, should not be heard to profess lack of means to detect counterfeits.

### 2. <u>Financial Benefit from Infringing Vendors</u>

Plaintiffs argue that the financial benefit prong of the vicarious liability test is also satisfied here because (1) Defendants receive fees from booths rented to vendors of counterfeit CDs and (2) alternatively, that the sale of counterfeit CDs served as a "draw" to bring customers to the Market.  Defendants counter by arguing that they received no benefit from the sale of counterfeit and pirated CDs and cassettes, and that Plaintiffs have failed to show any direct link between and the sale of counterfeit and pirated CDs and

30

financial benefits to Defendants.  For the following reasons, this Court disagrees with Defendants and holds that the financial benefit prong has been satisfied.

### a.   Direct financial benefit

In Fonovisa, the Ninth Circuit rejected the requirement that the financial benefit received by a flea market owner be tied directly to the sale of infringing music by way of a commission on infringing goods or otherwise.  See Fonovisa, 76 F.3d at 263. In the present case, the corporate Defendants receive a financial benefit through the rental of booths to vendors of infringing goods.  While the daily rental fee paid by an individual is low (between $20 and $30), the corporate Defendants are certainly deriving a financial benefit by renting booth space to vendors of counterfeit CDs and cassettes and, while each daily rental fee is small, the total yearly amount of fees generated through rentals to this type of vendor must be substantial.  This is especially true as these spaces would otherwise go unoccupied because the Market is usually not filled to capacity.[12]  (Pls.' SUF ¶ 17.)

---

[12]  This holding in no way contradicts earlier cases from other courts that a landlord is not responsible for the infringing acts of its tenants.  See e.g. Deutsch v. Arnold, 98 F.2d 686 (2d Cir. 1938); Fromont v. Aeolian Co., 254 F. 592 (S.D.N.Y. 1918).  In these cases, the courts "held that a landlord who lacked knowledge of the infringing act of its tenant and who exercised no control over the leased premises was not liable for infringing sales." Fonovisa, 76 F.3d at 262.  The facts here present a different picture as Defendants both (1) knew of infringing acts (as discussed in Section III.C.1, infra) and (2) exercised substantial control over the Market (as

**b.   Infringing music as a "draw"**

Alternatively, this Court finds that the sale of counterfeit and pirated CDs was a "draw" to the Market.  The <u>Fonovisa</u> court held that "the sale of pirated recordings at the [flea market] is a 'draw' for customers as was the performance of pirated music in the 'dance hall cases' and their progeny."[13]  <u>Fonovisa</u>, 76 F.3d at 263-64.  The court found that, as a result of this draw, the flea market received several benefits, including admission fees, increased revenue from concession stands, and parking fees.  <u>See id</u>. at 263.  The district court in <u>Sinnott</u> applied the <u>Fonovisa</u> rule to a situation that is factually similar to the present case and held that the defendant in <u>Sinnott</u> "received the same benefit as did [the defendant] in <u>Fonovisa</u> ...[as] infringing music, sold at 'bargain basement' prices, was a 'draw' for...customers."  <u>Sinnott</u>, 30 F. Supp. 2d at 1002.  While the customers were not charged admission, the "draw increased revenue at [defendant's] concession stands...and [defendant's] go-kart track located on the property."  <u>Id</u>. at 1002-03.

---

discussed in Section III.B.1, <u>supra</u>.)

[13]  The "dance hall cases" are a line of cases in which the operator of an entertainment venue was held liable for infringing performances when the operator (1) could control the premises and (2) obtained a direct financial benefit from the audience, who paid to enjoy the infringing performance.  <u>See</u> <u>Buck v. Jewell-LaSalle Realty Co.</u>, 283 U.S. 191, 198-99; <u>Dreamland Ball Room, Inc. v. Shapiro, Bernstein & Co.</u>, 36 F.2d 354 (7th Cir. 1929.)

The case law indicates that the presence of infringing music does not need to be a significant draw to establish vicarious liability, only that infringing music must be "a" draw. Fonovisa, 76 F.2d at 263; see Ellison v. Robertson, 357 F.3d 1072, 1079 (9th Cir. 2004)("There is no requirement that the draw be substantial.")  For example, in Polygram Int'l Publ'g, Inc. v. Nevada/TIG, Inc., 855 F. Supp. 1314, 1331-32 (D. Mass. 1994), the court found that trade show organizers benefitted from exhibitors' infringement even though only four out of 2000 exhibitors played music in violation of the plaintiffs' copyrights.  In addition, the Ninth Circuit has held in Napster that financial benefit accrues merely because "the availability of infringing material acts as a 'draw' for customers."  239 F.3d at 1023.  Finally, the First Circuit Court of Appeals has held that a racetrack owner received financial benefit when an entertainer it hired to amuse fans between races played copyrighted music without a license.  See Famous Music Corp. v. Bay City Harness Horse Racing and Breeding Ass'n, 554 F.2d 1213, 1214 (1st Cir. 1977).

This Court will follow the rule set out in Fonovisa and Sinnott in holding that corporate Defendants received financial benefit from infringing vendors because the illegal vendors serve as a "draw" which increased the number of customers shopping at the Market.  Unlike the defendants in Fonovisa and Sinnott,

33

Defendants' only source of revenue was booth rentals and not customer admission and parking (as in <u>Fonovisa</u>) nor concessions and amusements (as in <u>Sinnott</u>).  However, elementary economics indicates that the greater the number of customers into the Market, the more vendors the Market will attract and/or the higher daily rental fees the Market can charge each vendor. Thus, anything that serves as a "draw" for customers will necessarily serve to increase revenues generated by the Market and thereby directly financially benefit all Defendants.

The expert testimony of Dr. Stephen Nowlis further supports the fact that the sale of infringing CDs and cassettes served as a draw to the Market.  Dr. Nowlis' report found that (1) recorded music adds variety to the available product mix at the market and (2) counterfeit CDs and cassettes are a particularly important product category to the Market's visitors, and Nowlis concluded that the availability of infringing music draws customers to shop for music at the Market.[14]  (<u>See</u> Nowlis Decl. Ex. 1.)  Defendants

---

[14]  Defendants filed a motion to exclude Dr. Nowlis' testimony and report, claiming that the expert opinion failed to meet the standard set forth in <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579 (1993) and <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137 (1999) and therefore the report is inadmissible under Fed. R. Evid. 102 and 702.  Specifically, Defendants argue that (1) Nowlis did not use accepted methodology in preparing his report, (2) the report was prepared for the <u>Sinnott</u> case and simply "retrofitted" the <u>Sinnott</u> report to fit this case, (3) Nowlis did not perform any independent research in formulating his opinion and misrepresents data from the materials upon which he relied and (4) Nowlis' conclusions do not reasonably flow from the facts known and methodology used.

The Court finds that the opinion and report meet the requirements of reliability set forth in <u>Daubert</u>.  According to his report, Nowlis was asked "to analyze how the sales of infringing recorded music...at flea markets generally, and Columbus Farmers Market specifically, may ...increase the number...of customers that are drawn to the flea market...." (Nowlis Report at 2.)  The methodology used by Dr. Nowlis in the preparation of his report appear consistent with the approach used by experts in the field of marketing and consumer behavior. Dr. Nowlis (1) reviewed a large body of scholarly literature, on subjects such as multiple retail outlets, and his own scholarly research and (2) reviewed, in relation to the body of scholarly research, information he obtained through three days of personal observation at the Market as well as a review of deposition transcripts, newspaper articles about the Market and the Market's advertising.  (Nowlis Depo. Tr. 16, 228, and 230.)  From this, Nowlis drew four sub-conclusions - that recorded music adds variety to the Market's product mix, infringing music is an attractive product category to Market customers, the availability of unique infringing compilations of recorded music gives the Market something that consumers cannot get from other outlets, and that the availability of infringing music at below market prices is an incentive for consumers to shop at the Market. (Nowlis Report 2-3.)  From these sub-conclusions, Nowlis ultimately concluded that "the presence of infringing music is a powerful means of increasing the draw of consumers" to the Market.  (<u>Id</u>.)

Defendants' argument that the Nowlis report is inadmissible because he "retrofitted" the report he submitted in the <u>Sinnott</u> case to apply to this case does not undermine the methodological reliability and the "fit" of Nowlis' opinions to the facts of this case.  It is true that reports in the two cases are very similar.  (Certification of Joshua B. Ryan ¶ 5, "Marked up" copy of the Nowlis Report.) However, this is not surprising nor does it cause the Court to question the reliability of Nowlis' conclusions because: (i) the <u>Sinnott</u> case and the present case are based on very similar facts; (ii) in both cases, Nowlis was asked to opine on the impact of infringing music on flea markets in general, as well as on the specific flea markets at issue, so it stands to reason that some of information would be the same; and (iii) Nowlis' conclusions (e.g., that unique goods or low priced music serve as a draw for consumers) are premised on existing scholarly research and it makes sense that Nowlis' summary of this research in both cases would be similar, as the field of study is the same.  While the reports are similar, the

also submit an expert report.  The report of Dr. Michael
Rappeport determined that only 9% of people surveyed came to the
market expecting to purchase CDs, and that such a small
percentage was not a draw because of the large number of
"legitimate" CD sellers at the Market.  (Declaration of Dr.
Michael Rappeport ¶ 3, Ex. 1).

Dr. Rappeport's opinion and his finding that 9% of the
customers coming to the market expect to purchase CDs, does not
create a dispute that is material.  This Court accepts Dr.
Rappeport's findings, since Defendants are entitled to all
favorable inferences flowing from his report.  Under either
expert's view, a sizable number of customers - whether 9% as Dr.
Rappeport says or a higher percent as Dr. Nowlis says - are
attracted to the Market to buy CDs.  This amounts, in either

--------

Court finds that Nowlis' report in this case is sufficiently
tailored with respect to the Columbus Farmers Market, however.
Finally, Defendants take issue with the fact that Nowlis did not
conduct a survey of consumers at the market.  This argument is
unpersuasive as Nowlis had legitimate practical reasons for
determining that a survey would not yield the best results.
(Nowlis Depo. Tr. at 229)(stating that consumers are unlikely to
"volunteer" information concerning the purchase of illegal
merchandise.)  While Nowlis may be confronted on these points at
trial, these arguments go to the weight, not the admissibility,
of his opinion testimony.

Therefore, Dr. Nowlis' report is admissible under Fed. R.
Evid. 702 and Defendants' objection to Dr. Nowlis' opinion and
report is overruled and Defendants' motion to exclude is hereby
denied.

event, to thousands of customers per month, even under
Rappeport's scenario.  Thus, the presence of CDs (including
counterfeit and pirate CDs) would serve as a "draw" to the
Market.

Accordingly, summary judgment should be entered in favor of
Plaintiffs and against the corporate Defendants on the claim of
vicarious liability.

### C.   **Contributory Infringement**

#### 1.   **Plaintiffs' Motion for Summary Judgment**

In order to prove that Defendants are liable for
contributory infringement, Plaintiffs must demonstrate that
Defendants (a) had knowledge of infringing activity and (b)
"induce[d], cause[d], or materially contribute[d] to the
infringing conduct of another."  Gershwin Publ. Corp., 443 F.2d
at 1162; see also Columbia Pictures Indus., Inc. v. Redd Horne,
Inc., 749 F.2d 154, 160 (3d Cir. 1984)(calling the holding of
Gershwin "well-settled."); Fonovisa, 76 F.3d at 263.  Plaintiffs'
argue that Defendants (a) had both actual and constructive
knowledge of infringement on the part of the Market's vendors and
(b) "materially contributed" to this infringement by providing an
environment for these activities to occur.  (Pls.' Br. at 8.)
Defendants contend, however, that Plaintiffs failed to
demonstrate either of these two elements, arguing that the Court
should grant its motion for summary judgment (at least with

37

respect to infringement of any copyright covering CDs seized on November 7, 2002) because Defendants lacked the requisite intent to infringe Plaintiffs' copyrights (as evidenced by Defendants assisting representatives and police during the November 7, 2002 raid of the Market.)

### a.   Knowledge of Infringing Activity

Plaintiffs and Defendants dispute both the requisite standard of knowledge and whether or not Defendants had knowledge of infringement.  Plaintiffs contend that, for a claim of contributory infringement, a party need only show that the defendant knows or should have known of the infringing activity (i.e., have actual or constructive knowledge).  See Gershwin, 443 F.2d at 1162; A&M Records, Inc. v. Napster, Inc., 239 F.3d 1004 (9th Cir. 2001)(hereafter "Napster").  To the contrary, Defendants argue that the knowledge element is satisfied only in cases where a party has actual knowledge of specific infringement or where a party has proved that the defendant has turned a blind eye to such infringing activity.  (Defs.' Opp. Br. at 2 citing Aimster, 334 F.3d at 649; see also Religious Tech. Center v. Netcom Commun. Srvs., Inc., 907 F. Supp. 1361, 1373-74 (N.D. Cal. 1995)(the knowledge requirement is not met unless the defendant has notice of the infringement at the time it provided the services that permitted the infringement to occur.)  Defendants further argue that "mere knowledge of potential or actual

38

infringing uses would not be enough" to subject a distributor of a product or device to contributory infringement liability. Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd., 125 S. Ct 2764 (2005)(hereafter "Grokster").

Here, Plaintiffs need only prove that Defendants had constructive knowledge of infringement.  Contributory infringement "requires that the secondary infringer 'know or have reason to know of direct infringement.'"  Napster, 239 F.3d at 1020 (quoting Cable/Home Communication Servs., Inc. v. Network Prods., Inc., 902 F.2d 829, 845-46 (11th Cir. 1990); see also July 12 Opinion at 17 ("Constructive knowledge of infringing activity is sufficient for [purposes of proving] contributory infringement.")  In addition, turning a "blind eye" to infringement is the equivalent of knowledge.  Aimster, 334 F.3d at 650.

Defendants are incorrect that Plaintiffs are required to prove that Defendants had knowledge of "specific infringement(s)" "at the time the Defendants materially contributed to the direct infringement," (Defs.' Opp. Br. at 2, 6,) as Defendants' argument runs contrary to the holdings of Fonovisa and Napster.  Moreover, Defendants' citation of Grokster is unpersuasive as Grokster is clearly distinguishable from this case.  In Grokster, respondent-defendant was a company that distributed free software that allowed computer users to share electronic files through peer-to-

39

peer networks.  <u>See</u> 125 S. Ct. at 2770.  Although such networks can be used to share any type of file, users mainly use software to share copyrighted music without authorization.  <u>See</u> <u>id</u>. at 2772.  The respondent-defendant was aware that users used the software mainly to download copyrighted files.  <u>See</u> <u>id</u>. at 2772-74.

In adopting the "inducement rule" from patent law and applying it to copyright law, the Supreme Court held that "one who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third-parties."  <u>Id</u>. at 2780. The Court continued, holding that "just as <u>Sony</u> did not find intentional inducement despite the knowledge of the VCR manufacturer that its device could be used to infringe, mere knowledge of infringing potential or of actual infringing uses would not be enough to subject a distributor to liability."  <u>Id</u>. (<u>citing</u> <u>Sony Corp. v. Universal City Studios</u>, 464 U.S. 417, 439 n.19 (1984)).

Here, the corporate Defendants are not distributors of a device or product that has non-infringing uses like in <u>Grokster</u> and <u>Sony</u>.  In those cases, once the defendant released the device into commerce, the defendant had no control of the end-user's use of the device (whether for infringing or non-infringing use).  In

40

contrast, here, the corporate Defendants operate an ongoing business in which they exert substantial and continuous control over the operations of the Market, the types of goods sold there, and the behavior and actions of the direct infringers, the vendors.  The fact that the corporate Defendants have such a high degree of control over the vendors and what merchandise the vendors sell at the Market, as well as where and when they sell it, clearly distinguishes this case from <u>Grokster</u>.

Having established that the constructive knowledge standard established in <u>Gershwin</u> and <u>Napster</u> applies, this Court finds that the corporate Defendants knew or should have known that vendors in the Market were selling infringing merchandise. Specifically, Plaintiffs point out the following without material contradiction:

- On a daily basis, Ackerman, Pratt and other market employees "walked the market," personally visited each vendor's booth and are authorized (and do) perform inspections of booths.  (Ackerman Dep. Tr. at 50.)  At the time they checked booths for prohibited sale items (such as firearms)(<u>Id</u>.);

- RIAA investigators and, at times, Springfield Township Police, alerted Market employees to the fact that thousands of counterfeit sound recordings were being sold at the Market.  Such activities led to the 1993 Raid and the 1994 Raid during which thousands of counterfeit CDs and cassettes were seized (Pls.' SUF ¶¶ 176-77; Abbott Decl. ¶ 17); and

- Between 2000 and 2002, RIAA investigators or counsel to the RIAA informed Defendants numerous times (either in writing or orally) that vendors were selling counterfeit sound recordings.  (Pls.' SUF ¶¶ 208-214, 220-223, 225-241.)

These facts are sufficient to satisfy the Court that there is no genuine issue of material fact that the corporate Defendants had knowledge of infringing activity according to the standard set forth in Gershwin and Napster.

### b.   Material Contribution to Direct Infringement

Under the Ninth Circuit's holding in Fonovisa, a flea market "materially contributes" to infringement on its premises by providing the "site and facilities" or the "environment and market" for infringing activity.  Fonovisa, 76 F.3d at 264 (by providing the space, utilities, parking, advertising, plumbing and customers, the flea market provided "the environment and the market for counterfeit recording sales to thrive.")  Providing such an environment and services, "is all that is required to satisfy the requirement of material contribution necessary to establish contributory liability."  Sinnott, 300 F. Supp. 2d at 1001.  Plaintiffs need only provide a central "hub" for infringing activity to materially contribute to infringement.  See Fonovisa, 76 F.3d at 264 ("it would be difficult for the infringing activity to take place in the massive quantities alleged without the support services provided by the swap meet"); see also PolyGram Int'l Publ'g, Inc. v. Nevada/TIG, Inc., 855 F. Supp. 1314, 1323 (D. Mass. 1994).

The corporate Defendants provide a similar site and services to those considered in Fonovisa and Sinnott.  These Defendants

provide vendors with basic requirements such as wooden tables, and booth spaces, security, free parking, maintenance of the market grounds (including cleaning and repair), and restrooms. (Pls.' SUF ¶¶ 65, 71-73, 79-80, 88-89, 91.)  They also provide extensive advertising for the Market (including maintaining a web site and organizing holiday-themed events) and work to attract customers to the Market (by, for example, "tipping" bus drivers who bring customers to the Market).  (Id. ¶ 60-63.)  The Market also provides refunds to customers who purchase fraudulent or defective merchandise and enforces rules and regulations.  (Id. ¶ 69-70.)

Defendants argue that the services provided by Defendants are not sufficient as a matter of law to establish that Defendants made a material contribution to vendors' infringement. Instead, Defendants argue that, under Grokster's "inducement rule" a party can only be liable for contributory infringement if it "promotes" or takes "affirmative steps...to foster infringement." (Defs.' Opp. Br. at 12 citing Grokster, 125 S. Ct. at 2780).  Thus, Defendants argue, summary judgment is inappropriate because Defendants have a defense that the "vehicle" (here, the Market) used for infringement has "non-

infringing as well as infringing uses." (Id., citing Aimster, 334 F.3d at 649.)[15]

Here, Plaintiffs do not need to show that Defendants took steps to "foster" or "promote" infringement at the Market.  The holding in Sony or Grokster cannot be applied here to avoid contributory infringement liability because Defendants' business is not analogous to a device put into the stream of commerce. Moreover, in dicta, the Sony court stated that liability for contributory infringement may be appropriate where, as here, there is "an ongoing relationship between the direct infringer and the contributory infringer at the time the infringing conduct occur[s]." Sony, 464 U.S. at 437.  Thus, Defendants' argument is unpersuasive.

### 2.   Defendants' Motion for Summary Judgment

Defendants argue that, because they worked closely with the Springfield Township Police Department in an attempt to bring an end to some of the infringing activity at the Market and worked with police to remove allegedly counterfeit materials from the Market after the November 7, 2002 Raid, Plaintiffs cannot show that Defendants had the requisite intent necessary for a finding of  contributory infringement.  (Defs.' Br. at 21-33.)

---

[15]   In putting this defense forward, Defendants appear to analogize the flea market to an allegedly infringing device. (Id. citing Aimster, 334 F.3d at 649, and Sony Corp. of America, 464 U.S. at 435.)

Defendants' argument centers on distinguishing themselves from
the defendants in Fonovisa by proving that they worked to
prevent, rather than encourage, the sale of counterfeit sound
recordings at the Market.  (Id.)  Defendants rely on this Court's
finding[16] that the Supreme Court's recent decision in Grokster
will apply to this case and as such, Plaintiffs need to establish
that Defendants intentionally induced or encouraged direct
infringement in order to prove liability for contributory
infringement.  (Id. at 27, citing Grokster, 125 S. Ct. 2764.)

_____

[16]   In Grokster, the defendant, a company that distributed
free software that allowed computer users to share electronic
files through peer-to-peer networks, was sued for contributory
infringement.  See 125 S. Ct. at 2770.  Users of the networks
mainly used the software to share copyrighted music without
authorization.  See id. at 2772.  The Supreme Court held that
"one who distributes a device with the object of promoting its
use to infringe copyright, as shown by clear expression or other
affirmative steps taken to foster infringement, is liable for the
resulting acts of infringement by third-parties."  Id. at 2780.

As discussed supra, this Court found Grokster to be
distinguishable from the present case because unlike the
defendant in Grokster, Defendants are not distributors of a
device that has non-infringing uses where the only contact
between defendant and the direct infringer is the point of sale
and once the defendant releases the device into commerce, the
defendant has no control over whether the end-user's uses of the
device to infringe. In contrast, here, Defendants operate a
market - an ongoing business in which it exerts substantial and
continuous control over the actions of the direct infringers.
The infringement takes place in Defendants' own Market, an
environment over which they exert (or can exert) a great degree
of control (as evidenced by the fact that the Market regulates
the sale of certain items and actually manages competition.)
This degree of control over the actions of the direct infringers
distinguishes this case from Grokster.

According to Defendants, if the Court finds that the materiality of Defendants' contribution to the infringing activity is insufficient as a matter of law, then summary judgment on this issue must be granted.

With Grokster as the standard for determining contributory infringement, Defendants argue that Plaintiffs' claim fails as a matter of law.  This is because Defendants' actions on November 7, 2002 of (1) contacting with the Springfield Township Police, (2) working with police to identify vendors selling counterfeit CDs and (3) helping pack up the counterfeit CDs seized shows that Defendants had no intent to contribute to infringement.  As such, Defendants assert that this Court, as a matter of law, can find that Defendants did not materially contribute to infringement.

Defendants' motion for summary judgment as to contributory infringement will be denied for two reasons.  First, if the Court accepts Defendants' argument that Grokster is the appropriate law to apply, the Court would be applying the "inducement rule"[17] - a rule that the Supreme Court applied to hold contributorily liable a software manufacturer whose product was distributed with the

----

[17]   In Grokster, the Supreme Court stated that the "inducement rule" can be applied to "one who distributed a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement" and that "mere knowledge of infringing potential or actual infringing uses would not be enough here to subject a distributor to liability."  Grokster, 125 S. Ct. at 2780.

principal, if not exclusive, object of promoting its use to
infringe copyright - to an operator of a flea market, an ongoing
business over which Defendants retain continuous control.
Determining that application of this doctrine to the Market makes
little sense and the absence of authority suggesting that such
application is appropriate, this Court declines to do so.

Second, although issues of whether Market employees may have
contacted authorities on November 7, 2002 or worked with police
and the RIAA investigators on November 7, 2002 to escort police
and pack-up counterfeit CDs are in dispute, this dispute is not
material.  A fact is "material" only if it might affect the
outcome of the suit under the applicable rule of law.  <u>See</u>
<u>Liberty Lobby, Inc.</u>, 477 U.S. at 248.  Here, the intent of
Defendants is not relevant as Defendants materially contribute to
infringement by simply providing the environment - space,
facilities and other services - where infringing activity occurs,
controlling the merchandising therein, and deriving daily
economic benefit through rental of space to the infringers.  <u>See</u>
<u>Fonovisa</u>, 76 F.3d at 263; <u>Sinnott</u>, 109 F. Supp. 2d at 1002.

D.   **Personal Liability for Ackerman and Pratt**

Plaintiffs argue next that the principals of Columbus
Farmers Market and Columbus Flea World - Ackerman and Pratt - are
each personally liable for contributory copyright infringement
and vicariously liable for copyright infringement stemming from

47

the infringing activities of the Market's vendors.  The Third
Circuit has held that "[a]n officer or director of a corporation
who knowingly participates in [copyright] infringement can be
held personally liable, joint and severally, with the corporate
defendant."  Columbia Pictures Indust., Inc. v. Redd Horne, Inc.,
749 F.2d 154, 160 (3d Cir. 1984).

Plaintiffs contend that Ackerman and Pratt can each be
individually liable for contributory infringement since they
personally had actual or constructive knowledge of - and
materially contributed to - infringement.  As discussed in
Section III.C.1.a, supra, with respect to contributory
infringement, Defendants collectively, have actual and
constructive knowledge of the sale of infringing sound recordings
due to (i) regular inspections of vendor sites during regular
weekly "walk-throughs" of the Market by Market personnel and
Ackerman and Pratt, (ii) information gained from contact with
authorities and the RIAA during the various raids on the Market
from 1993-2002, and (iii) through extensive contact with the RIAA
(both through written correspondence and meetings) regarding
infringing activities.

However, the Court finds it appropriate to distinguish
between what the corporate Defendants (Columbus Farmers Market,
LLC and Columbus Flea World) knew or should have known about
infringement and what Ackerman and Pratt, personally, knew or

48

should have known about the sale of infringing goods at the
Market.  Corporate liability arises from what the responsible
corporations knew or should have known in their corporate
capacities as the owners and managers of the Market.  Individual
liability of a corporate officer, however, must necessarily stem
from what he or she knew or should have known, as an individual,
at the particular places and times when the infringing activity
of the vendors was discovered.  It does not seem indisputable to
impute knowledge of what any one of over 1,500 vendors is selling
at the Market on to Ackerman and Pratt personally, even though
they were in charge of the day-to-day operations of the Market.
While the corporate Defendants had a duty to know what was going
on in the Market that infringing goods were being sold there and
to take steps necessary to detect and eliminate the infringement,
the Court finds that genuine issues of material fact exist
regarding how much, on any given day, Ackerman and Pratt
personally knew about infringing activities in the Market.  As
such, Plaintiffs will be required to prove at trial that, on the
days when Plaintiffs claim infringing activities occurred,
Ackerman and Pratt personally knew that infringing activity was
occurring, in order to demonstrate Ackerman and Pratt's "knowing
participation."

Plaintiffs also argue that Ackerman and Pratt can be
personally liable for vicarious infringement, arguing that

Ackerman and Pratt personally had the ability to supervise or control the infringing vendor sales, failed to do, and derived personal financial benefit from these sale.  See Playboy Enter., Inc. v. Starway Publ'g Corp., 900 F. Supp. 438, 441-42 (S.D. Fla. 1995)(corporation president held personally liable for vicarious infringement).  Plaintiffs' point out that Ackerman and Pratt (a) were the "bosses" and, as day-to-day managers of the market, had the ability to supervise and control the activity of the vendors (including such complex matters as competition among vendors) and (b) as owners of the controlling interests in the entities that owned the market, directly benefitted financially from increased revenue to the Market.

        Defendants argue that Ackerman and Pratt are simply members of a limited liability company and as such, they do not have the right or ability to supervise vendors selling allegedly infringing CDs.  (Defs.' Opp. Br. at 29 citing Burdick v. Koerner, 988 F. Supp. 1206, 1210 (E.D. Wis. 1998)).  This is incorrect: as previously explained, Ackerman and Pratt can be liable for their own individual acts and omissions.  This Court has twice rejected Defendants' argument that Ackerman and Pratt can avoid personal liability because they are employees or owners of a corporate entity.  See July 12 Opinion at 21-25 (Ackerman and Platt's liability is premised on "their individual acts and omissions" not derivatively based on their employment by or

relationship to any corporation.); <u>Flea World</u>, 356 F. Supp.2d at 417 (same).  Thus, Defendants' corporate immunity argument is without merit.  But, by the same token, Ackerman and Pratt are not imputed to enjoy the same knowledge as their corporations, nor are they presumed to have engaged in the same acts or omissions as their corporations, merely by their status as corporate officers or owners.

Even without accepting Defendants' corporate immunity argument, the Court finds it appropriate again to distinguish between the corporate Defendants (that own the land on which the Market resides and operate the Market) and the individual Defendants.  The Court concluded in Section III.B.1, <u>supra</u> that the corporate Defendants exercised control over the Market and supervised vendor conduct and sales of merchandise.  Indeed, much of the corporate liability of Columbus Farmers Market, LLC and Columbus Flea World, LLC for vicarious liability and contributory infringement, found <u>supra</u> in Parts III.B and C, arose from the knowledge, conduct and omissions of employees and officers, including Ackerman and Pratt or both.  That said, however, the Court finds that genuine issues of material fact exist regarding whether Ackerman and Pratt, individually, had the ability to control events at the Market.  There are genuine issues of material fact whether these individuals (apart from the corporate Defendants, collectively) had the right to supervise and control

51

what the vendors sold at the Market, and whether these
individuals (distinguished from the corporate Defendants)
knowingly participated in the infringing activity.  Upon the
present record, giving the individual Defendants all favorable
inferences, a reasonable factfinder could resolve these disputes
favorably or unfavorably to the individuals.

     Accordingly, Plaintiffs' motion for summary judgment with
respect to the issue of whether Ackerman and Pratt are personally
liable for contributory copyright infringement and vicarious
infringement will be denied.

### E.   Whether Claims Arising from the June 2000 Raid are Time-Barred

     Defendants argue that this Court must dismiss Plaintiffs'
claims arising from the June 2000 raid because Plaintiffs failed
to serve Defendants with the original complaint within 120 days
of filing as required by Fed. R. Civ. P. 4(m) and thus,
Plaintiffs' claims arising out of that raid are time-barred.
(Defs.' Br. at 3-7.)   Under Section 507 of the Copyright Act, a
plaintiff must file a civil action for infringement of copyrights
within three years of the infringement.  See 17 U.S.C. § 507.  On
June 3, 2003, Plaintiffs filed the original complaint containing
claims arising from a June 4, 2000 raid.  Although Plaintiffs
filed the action within the three-year statute of limitation,
Plaintiffs never served Defendants with the original complaint.
Instead, Plaintiffs filed a First Amended Complaint on October 1,

52

2003 which was served on October 8, 2003 - four days after the 120-day required filing period expired.  (Id. at 3-4.)

Defendants argue that, because Plaintiffs failed to serve Defendants within the 120-day period as required by Rule 4(m) this Court should dismiss all claims arising from the June 2000 raid.  See Fed. R. Civ. P. 4(m);[18] see also Ocasio v. Fashion Institute of Tech., 86 F. Supp.2d 371 (S.D.N.Y. 2000). Defendants claim that Plaintiffs never asked for an extension of time to serve, made no attempt to serve the original complaint on Defendants within the required period, and never returned calls from Defendants' attorney seeking a copy of the original complaint.  All claims arising after October 1, 2000, however would not be barred.

Plaintiffs counter by arguing that (1) Defendants' Rule 4(m) argument is untimely as Defendants' waived their right to make this argument and, alternatively that (2) Defendants argument is

---

[18]   Fed. R. Civ. P. 4(m) states:

If service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint, the court, upon motion or on its own initiative after notice to the plaintiff, shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time; provided that if the plaintiff shows good cause for the failure, the court shall extend the time for service for an appropriate period.

without merit. (Pls.' Opp. Br. at 3.)[19]  Specifically, with
respect to the merits of Defendants' argument, Plaintiffs point
out that Rule 4(m) gives the district court discretion to extend
time for service "even in the absence of good cause." Boley v.
Kaymark, 123 F.3d 756, 758 (3d Cir. 1997).  The Advisory
Committee Notes specifically state that "[r]elief [from the 120-
day rule] may be justified, for example, if the applicable
statute of limitations would bar the refiled action." Fed. R.
Civ. P. Adv. Comm. Notes (1993).  According to Plaintiffs, such a
dismissal in the present case would serve the opposite effect -
as it would bar Plaintiffs from bringing a claim for infringement
arising from the June 4, 2000 raid because the three-year statute
of limitations on infringement actions would have passed.  Thus,
Plaintiffs argue that dismissal under Rule 4(m) in this case
would be inconsistent with the purpose of the rule. (Id.)

---

[19]  Plaintiffs also contend that, as a threshold matter,
dismissal based on Rule 4(m) requires "notice to the plaintiff."
Fed. R. Civ. P. 4(m); (Pls.' Opp. Br. at 4.)  Plaintiffs argue
that, since Plaintiffs were never provided with notice, dismissal
is not warranted.  (Id.)  Moreover, Defendants did not seek
dismissal under Rule 4(m) until the present motion, filed almost
two years after service of the Amended Complaint.  A motion to
dismiss for untimely service under Rule 4(m) is normally brought
under Rule 12(b)(5) (insufficiency of service of process), and it
is waived if not asserted in a dismissal motion under Rule 12(b),
in accordance with Rule 12(h)(1) (pertaining to waiver).  Here,
Defendants previously sought dismissal of the Amended Complaint
under Rule 12(b)(6), but they neglected to raise this Rule 4(m)
issue and cannot do so now.

In the Third Circuit, the determination whether to extend
time to serve requires the district court to (1) first, determine
whether good cause exists for an extension of time and, (2) if no
good cause exists, to exercise its discretion to dismiss the case
without prejudice.  See Petrucelli v. Bohringer & Ratzinger, 46
F.3d 1298, 1312 (3d Cir. 1995).   First, the Court determines
that good cause did exist for the Court to extend time to serve.
Between the filing of the original complaint and the expiration
of the 120-day period for service, Plaintiffs were completing a
substantially revised First Amended Complaint.  In fact,
Plaintiffs served the First Amended Complaint on Defendants on
October 1, 2003 - two days prior to the expiration of the 120-day
window to effect service.  [Docket Item No. 3.]  In a situation
where an amended complaint has been filed that supercedes the
original complaint, enforcement of the 120-day period "may be
found to be unnecessarily wasteful." 4B Charles Alan Wright &
Arthur R. Miller, Federal Practice and Procedure § 1137 (3d ed.
2002).

Even absent good cause, the Court, using its discretion,
would extend the time for service as dismissing Plaintiffs'
claims arising from the June 2000 raid would have the effect of
barring the claims on statute of limitations grounds.  Such a
result would run contrary to the purposes of Rule 4(m).  See Fed.
R. Civ. P. 4(m) Adv. Comm. Notes (1993) ("relief [under Rule

4(m)] may be justified, for example, if the applicable statute of limitation would bar the refiled action"); see also Boley, 123 F.3d at 759.   Thus, the Court will not dismiss Plaintiffs' claims arising from the June 2000 raid based on a failure to serve the original complaint on Defendants within 120 days of filing.

###   F.   **Plaintiffs' Maximum Potential Statutory Damages Award**

In their motion, Defendants argue that Plaintiffs should be entitled to recover statutory damages for only the 832 copyright registrations produced by Plaintiffs and referenced in the Second Amended Comp rather than the over 7,000 separate song titles as Plaintiffs claim.   (See SAC ¶ 30, Schedule A.)   This limitation is based on the fact that Plaintiffs produced only 832 copyright registrations with each registration directed to recordings containing collections of individual songs.   As such, according to Defendants, the registrations are compilations, and under Section 504(c) of the Copyright Act, Plaintiffs may only collect statutory damages for infringement of each compilation rather than the individual songs contained in the collective works.[20]

_____

[20]   Section 101 of the Copyright Act defines "collective work" as a "work,...in which a number of contributions, constituting separate and independent works in themselves, are assembled into a collective whole."   17 U.S.C. § 101.

In addition, under Section 101, a "compilation" is defined as "a work formed by the collection and assembling of pre-existing materials or of data that are selected, coordinated or arranged in such a way that the resulting work as a whole

Under the Copyright Act:

> The copyright owner may elect, at any time before final judgment is rendered to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action, with respect to one work, for which any one infringer is liable for individually, or for which any two or more infringers are liable jointly and severally, in a sum of not less that $750 or more that $30,000 as the court considers just. **For the purposes of this subsection, all parts of a compilation or derivative work constitute one work.**

17 U.S.C. § 504(c)(1)(emphasis added).  Thus, an infringer is liable for statutory damages for the number of "works" he or she infringes.  See id.;[21] see Twin Peaks Prods. Inc. v. Publications Int'l, Ltd., 996 F.2d 1366 (2d Cir. 1993); Schiffer Publ'g, Ltd. v. Chronicle Books, LLC, 2005 U.S. Dist. LEXIS 416 (E.D. Pa. 2005).  The Copyright Act, however, fails to define the term "work."

Plaintiffs argue that the calculation of statutory damages should not be limited to the 832 copyright registrations submitted.  Rather, Plaintiffs contend that they are entitled to statutory damages for each individual song/track that a Market vendor has infringed.  "Works," according to Plaintiffs, and registrations are two different things.  See H.R. Rep. No. 1476,

---

constitutes an original work of authorship.  The term 'compilation' includes 'collective works.'"  Id.

[21]  Plaintiffs have previously advised the Court and Defendants that they seek only statutory damages - not lost profits - in this case.

94th Cong., 2d Sess. at 162 (1970)(showing that Congress intended to draw a sharp distinction between the number of "works" and the number of registrations.)  Thus, Plaintiffs argue that, even though they have submitted one "registration" of a collective work consisting of several songs, each song is a "work" for the purposes of calculating statutory damages under § 504(c)(1) because each song has an "independent economic value."

Two recent cases from the Southern District of New York have examined the exact issue before the court - i.e., whether statutory damages should be computed on a "per song" or "per-CD" basis and have both concluded that, under § 504(c)(1) "works" means "per-CD."  UMG Recordings, Inc. v. MP3.Com, Inc., 109 F. Supp. 2d 223, 224-25 (S.D.N.Y. 2000); Country Road Music, Inc. v. MP3.Com, Inc., 279 F. Supp. 2d 325, 332 (S.D.N.Y. 2003). Although neither decision is binding on this Court, having considered these cases and concluding that they are well-reasoned, this Court will follow the rule established in them.

Moreover, Plaintiffs' argument that statutory damages should be calculated on a "per-song" basis runs afoul of the very subsection of the Copyright Act that authorizes the award of statutory damages.  See UMG Recordings, Inc., 109 F. Supp. 2d  at 224-25.  Section 504(c)(1) expressly states that "[f]or the purposes of this subsection, all parts of a compilation or derivative work constitute one work."  Moreover, the legislative

history of § 504(c)(1) "makes clear...that, although they are regarded as independent works for other purposes, 'all the parts of a compilation or derivative work constitute one work'" for the purposes of determining an award of statutory damages.  Id. quoting H.R. Rep. No. 1476, 94th Cong., 2d Sees. 162, reprinted in 1976 U.S.C.C.A.N. 5659, 5778.  Furthermore, Plaintiffs' arguments that each song has "independent economic value" for the purposes of calculating statutory damages in unpersuasive "in the face of unequivocal statutory language...," UMG Recordings, Inc., 109 F. Supp. 2d  at 225; Country Road Music, Inc., 279 F. Supp. 2d at 332, and the Third Circuit never adopted the "independent economic value" test, so far as this Court's research discloses.[22]

        This Court agrees with the UMG Recordings, Inc. court when it stated that "[w]hen Congress speaks, the courts must listen...[and] [w]hen, as here, Congress' statement is clear, to disregard that message would be nothing less than an unconstitutional arrogation of power by the judiciary." 109 F. Supp. 2d at 225.  Further, to apply the "independent economic value" test to statutory damages would be "to make a total mockery of Congress' express mandate that all parties of a compilation be treated as a single 'work' for purposes of

_____

        [22]   The Court notes too that a number of other courts have addressed and rejected the same or similar arguments to those made by Plaintiffs here. See Xoom, Inc. v. Imageline, Inc., 323 F.3d 279 (4th Cir. 2003); Schiffer Publ'g, Ltd., 2005 U.S. Dist. LEXIS at *8-9.

computing statutory damages" and this Court declines to do so. Id. Accordingly, statutory damages must be limited per "work" infringed, treating the compilation in a CD as one "work" for purposes of 17 U.S.C. § 504(c). Defendants' cross-motion for summary judgment, then, will be granted in part to limit available statutory damages accordingly.

## IV. __CONCLUSION__

For the reasons expressed above, this Court will (1) grant in part and deny in part Defendants' motion for partial summary judgment and (2) grant in part and deny in part Plaintiffs' motion for summary judgment. The accompanying Order is entered.


__March 31, 2006__                    __ s/ Jerome B. Simandle__
Date                                    JEROME B. SIMANDLE
                                        United States District Judge